IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA, et
al.,

    Plaintiffs,

        v.

LOCKHEED MARTIN CORP., et al.,

    Defendants.

CIVIL ACTION FILE NO.

1:09-CV-2381-TWT

ORDER

This is a *qui tam* action where the government declined to intervene. It is before the Court on Defendant Lockheed Martin Corporation's Motion to Dismiss [Doc. 28], Defendant Lockheed Martin Corporation's Motion to Dismiss Relators' First Amended Complaint [Doc. 35], and Relators Kathy Isley and Mark Wood's Motion for Sanctions Under Rule 11 [Doc. 41]. For the reasons set forth below, the Court DENIES as MOOT Defendant Lockheed Martin Corporation's Motion to Dismiss [Doc. 28], GRANTS in PART and DENIES in PART Defendant Lockheed Martin Corporation's Motion to Dismiss Relators' First Amended Complaint [Doc. 35], and DENIES Relators Kathy Isley and Mark Wood's Motion for Sanctions Under Rule 11 [Doc. 41].

## I.  Background

This case is brought by two relators, Kathy Isley and Mark Wood, against their former employer, Lockheed Martin Corporation.  Relator Isley was employed by Lockheed from June 1981 until May 1, 2012, and worked with Relator Wood from 2001 through early 2009.  Relator Wood was the Medical Director of Lockheed's Marietta, Georgia site from November 2002 through April 2009.  Wood was a Senior Occupational Staff Physician at Lockheed for 12 years prior to serving as the Medical Director.  (Am. Compl. ¶¶ 8-10).

According to the First Amended Complaint, Wood worked on a series of projects from 2005 through 2009 to reduce employment costs due to lost time. Initially, the Relators were asked to explore the methods for tracking Family Medical and Leave Act ("FMLA") hours of Lockheed Martin Aeronautical Systems Company ("LMASC") employees after Lockheed absorbed LMASC in 2004.  The Relators discovered that LMASC supervisors allowed their employees to submit an unlimited amount of FMLA leave time even though regulations cap FMLA leave time at 12 weeks annually.   The Relators reported their discovery and were praised for uncovering potential cost-saving methods for Lockheed.  (Am. Compl. ¶¶ 18-21).

Following the Relators' success in the LMASC investigation, an official from Lockheed's finance department asked the Relators to review the labor recording

system used by Lockheed's hourly employees.  Hourly employees input their labor hours into Lockheed's Salary Time & Attendance Recording System ("STARS"), which tracks the hours that employees enter on each project.  Employees are required to enter their hours into STARS with the appropriate code, such as the code for vacation hours, overtime hours, or actual labor hours.  STARS takes every hour entered by an employee, totals it by contract, and then bills all the actual hours worked on a specific contract to that contract and spreads the "lost time" (or non-actual work time) hours out across all of Lockheed's government contracts.  The Relators contend that the reports that the STARS system generates do not distinguish between actual labor hours and lost time, creating the impression that Lockheed employees work more hours on a contract than they actually did.  The Relators further contend that Lockheed falsely bills the government based on these STARS reports and utilizes the STARS data to justify adding even more employees to each government contract. (Am. Compl. ¶¶ 48-55).  As the Relators plunged into STARS, they discovered that many employees used absence codes during the regular work week and then worked weekend hours to make up for their lost time.  The employees would code the weekend hours as overtime despite having worked fewer than 40 hours in the week. (Am. Compl. ¶¶ 22-26).

Wood considered the ability to code overtime without actually working 40 hours a flaw in the labor tracking system and obtained permission to expand his Six Sigma project to determine the extent of the flaw. He and Relator Isley began searching Lockheed's data warehouse, which contained searchable data encompassing coding, billing, employees, dates, sites, contracts, and work orders. (Am. Compl. ¶¶ 28-31). The Relators catalogued thousands of instances of coding from 2005 to 2009 where employees had not actually worked 40 hours in a week but had billed overtime directly or indirectly to government contracts. (Am. Compl. ¶¶ 32-34). Wood presented the coding he had catalogued to the Office of Finance and Business Operations and to the Aeronautics Controller on September 7, 2006. The controller in turn granted Wood access to the weekly reports Lockheed presented to its federal customers. Wood contends these reports were worded in a way to hide the overtime coding practices he had discovered. Wood further contends the inaccurate disclosures were submitted on government contracts including the F-22 EMD contract as well as contracts for the P3, C-130, C-5, F-35 JSF, and F-16. (Am. Compl. ¶¶ 34-37).

The Relators contend the incorrect billing practices are extensive. According to their research, 98 employees at Lockheed's Palmdale site billed 139,000 hours of lost time from 2005 to 2007. This translates to 60 workdays of lost time per person per year being billed to the government, which the Relators allege resulted in

approximately $5 million in overpayments.  During the same time period, 135 employees at the Fort Worth location billed 146,000 hours of lost time, translating to 45 work days of lost time per person per year, costing the government $3.6 million in overpayments.  Similarly, 71 employees at the Marietta site billed 42 work days of lost time per person per year resulting in $1.5 million in overpayments.  (Am. Compl. ¶¶ 56-63).

The amended complaint also includes specific examples of the overtime billing practices.  The Relators discovered that Employee 584798 billed overtime every week from January 2007 through August 2007.  For 16 of those weeks, the employee was also paid for lost time.  Indeed, according to the Relators, the employee billed 96.3 hours of paid vacation and 94 hours of overtime during those 16 weeks.  In one week, in April 2007, the same employee recorded 50.2 hours of paid vacation along with 6.4 hours of overtime.  (Am. Compl. ¶¶ 90-92).  The Relators contend that the incorrect billing practices allow Lockheed to classify part-time workers as full-time workers for billing purposes.  (Am. Compl. ¶¶ 127-134).  The Relators further contend that the overuse of lost time billing leads to further fraudulent activity when employees make up their lost time.  The Relators state that the liberal use of lost time leads to "ghost overtime," which is overtime paid to an employee who actually worked fewer than 40 hours in a week.   (Am. Compl. ¶¶ 64-68).

The Relators reported all of their findings to Lockheed.  In December 2006, Wood gave a PowerPoint presentation to the Director of the Environment, Safety, and Health Department explaining his findings and introducing the "Workforce Performance Pilot" which included a feature that would ensure no overtime could be billed unless the employee actually worked over 40 hours in a given week.  After presenting his findings to several employees and departments, Wood was asked to give a presentation at the December 2007 "Kaizen event," a week-long process improvement activity on the sources and elimination of waste.  Wood contends Lockheed management valued the presentation and requested that the Relators expand their research.  Wood continued to present his findings to Lockheed management and, in 2008, began to emphasize his belief that Lockheed was overbilling the government for overtime resulting from vacation and holiday time.  (Am. Compl. ¶¶ 139-158).

Relator Wood was generally lauded for his findings regarding Lockheed's billing practices, and Lockheed awarded him the 2007 Aerostar and Nova Awards. However, according to Wood, once he began emphasizing that the billing practices were leading to overpayments from the government, the reception from Lockheed management chilled.  In August 2008, the human resources department investigated Wood's professional conduct following his routine medical examination of an incoming employee.  The investigation yielded nothing, but Wood contends he had

never been investigated before and that a senior human resource official was reportedly upset with the investigation's result.  In April 2009, Wood was called to a meeting and informed his employment with Lockheed was terminated, without a reason given.  Wood contends that his employees and co-workers considered him an excellent leader and found his termination unwarranted.  (Am. Compl. ¶¶ 160-175).

Likewise, about a month after the complaint in this case was unsealed, Relator Isley was informed she would have to assume the FMLA code processing duties of an outgoing employee, with no additional compensation.  Isley had formerly held FMLA processing duties and states she had made it clear to her superiors that she did not want to re-assume those duties.  On April 10, 2012, Isley's counsel wrote Lockheed's counsel and asserted that Isley's new assignment amounted to a constructive discharge.  Lockheed did not respond, and Isley tendered her resignation on April 19, 2012.  (Am. Compl. ¶¶ 176-181).

The Relators' two-count complaint was unsealed on February 22, 2012, when the United States declined to intervene.  The Relators assert a cause of action for violations of 31 U.S.C. § 3729, the False Claims Act, and a cause of action for violations of 31 U.S.C. § 3730, which protects whistleblowers from retaliation. (Am. Compl. ¶¶ 182-194).  Lockheed filed a motion to dismiss on August 14, 2012.  The Relators responded on August 31, 2012, and filed their first amended complaint.

Lockheed filed a motion to dismiss the Relators' First Amended Complaint on October 17, 2012, the Relators responded on November 30, and Lockheed filed a reply brief on December 17.  Separately, the Relators filed a motion for sanctions on January 9, 2013.

## II.  Motion to Dismiss Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief.  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009); Fed. R. Civ. P. 12(b)(6).  A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely."  Bell Atlantic v. Twombly, 550 U.S. 544, 556 (2007).  In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff.  See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A., 711 F.2d 989, 994-95 (11th Cir. 1983); see also Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994) (noting that at the pleading stage, the plaintiff "receives the benefit of imagination").  Generally, notice pleading is all that is required for a valid complaint.  See Lombard's, Inc. v. Prince Mfg., Inc., 753 F.2d 974, 975 (11th Cir. 1985), cert. denied, 474 U.S. 1082 (1986). Under notice

pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests.  See Erickson v. Pardus, 551 U.S. 89, 93 (2007) (citing Twombly, 127 S.Ct. at 1964).

### III.  Discussion

Lockheed moves to dismiss both counts of the Relators' amended complaint. Lockheed contends that the Relators fail to plead facts with particularity identifying any fraudulent conduct or identifying false claims that were actually submitted to the government.  Lockheed also argues that the Relators' retaliation claims should be dismissed because Relator Wood has not alleged that he engaged in protected activity or that he was retaliated for engaging in protected activity and because Relator Isley has not alleged she suffered an adverse employment action.

### A.    Count I - Violation of the False Claims Act

"To establish a cause of action under the False Claims Act, a relator must prove three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with knowledge that the claim was false."[1]   United States ex rel. Walker v. R & F Props.

---

[1]The Relators bring claims under Count I for violations of both 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(B).  (See Am. Compl. ¶¶ 183-84).  Claims under § 3729(a)(1)(B) do not require proof that the defendant presented a claim to the government.  See Hooper v. Solvay Pharms., Inc., 588 F.3d 1318, 1327 (11th Cir. 2009).  Because the Court concludes the Relators have not properly alleged a false or

of Lake County, Inc., 433 F.3d 1349, 1355 (11th Cir. 2005) (citing 31 U.S.C. § 3729(a)).  A complaint asserting a claim under the False Claims Act "must comply with Rule 9(b)'s heightened pleading standard, which requires a party to 'state with particularity the circumstances constituting fraud or mistake.'"  United States ex rel. Matheny v. Medco Health Solutions, Inc., 671 F.3d 1217, 1222 (11th Cir. 2012) (quoting Fed. R. Civ. P. 9(b)).  "The particularity requirement of Rule 9(b) is satisfied if the complaint alleges 'facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'"  Id. (quoting Hopper v. Solvay Pharms., Inc., 588 F.3d 1318, 1324 (11th Cir. 2009)).  "[T]he Eleventh Circuit applies Rule 9(b) to FCA claims on a case-by-case basis to determine if a plaintiff pleads particular details of a scheme to submit false claims paired with reliable indicia that claims were actually submitted."  Cade v. Progressive Community Healthcare, Inc., No. 1:09-cv-3522-WSD, 2011 U.S. Dist. LEXIS 76085, at *21-22 (N.D. Ga. July 14, 2011).  The Eleventh Circuit is "more tolerant toward complaints that leave out some particularities of a false claim if the complaint also alleges personal knowledge or

_____

fraudulent claim, the Court does not need to address whether claims were presented to the government.

participation in the fraudulent conduct." Id. at 1230 (quoting Walker, 433 F.3d at 1360).

Lockheed contends that the Relators have failed to plead their claims with particularity.  More specifically, Lockheed argues that the Relators have not explained how the billing scheme they describe led to charges to the government that were in fact improper; that the Relators have not identified which contracts were overstaffed as the result of these billing practices or how they were overstaffed; that the Relators have not explained why the so-called "ghost overtime" pay was improper; and the Relators have not explained how the allegedly fraudulent billing practices led to improper assignations of full-time status.   In general, Lockheed states the Relators have not described with particularity a scheme that was false or fraudulent.

The Relators assert that their *qui tam* claims are founded on the following Lockheed practices: (1) Lockheed employees abuse the lost time billing codes in order to shift their weekend to the middle of the work week and bill overtime for working on the weekends, and the lost time from the middle of the week is spread across Lockheed's customer contracts; (2) Lockheed bills the government for "ghost overtime," or overtime charged before an employee has actually worked 40 hours in a week; and (3) Lockheed submits reports to the government that fraudulently conceal the lost time and ghost overtime charges by failing to distinguish between lost time

and actual labor.  (Relators' Br. in Opp'n. to Def.'s Mot. for Summ. J., at 4-6).

According to the Relators, the fraud stems from the STARS billing system, which fails

to distinguish between actual time worked and lost time, comprising sick, vacation,

and FMLA time.  Because STARS does not itemize actual and lost time, the reports

it generates do not establish how many labor hours were actually spent on a project.

This scheme purportedly allows Lockheed to pad further estimates for contracts.  The

Relators contend that these practices violate Lockheed policy, Federal Acquisitions

Regulations, and the Fair Labor Standards Act.[2]

––––––––––––––––––––

[2]The Relators consistently argue that Lockheed judicially admitted that the billing practices described here could lead Lockheed to face liability under the False Claims Act.  In Ghani v. Lockheed Martin Space Sys. Co., No. C08-02120, 2009 U.S. Dist. LEXIS 79343 (N.D. Cal. Sept. 2, 2009), a former Lockheed employee sued Lockheed after he was terminated.  Lockheed argued that the employee had been terminated for allowing a subordinate employee to bill and receive compensation for nearly eight months in violation of company policy and "without proper authorization." Id. at *4. The Relators here note that, in Ghani, Lockheed stated that "mischarging of time may result in suspension or even debarment of [Lockheed's] status as a U.S. Government contractor, subjecting the company to liability under the Civil False Claims Act." Id. at *8-9.  Pretermitting the issue of whether Lockheed's arguments in Ghani are inconsistent with its arguments here, the Court concludes this was not a judicial admission relevant to this case.  "Normally judicial admissions are binding for the purpose of the case in which the admissions are made, not in separate and subsequent cases." Cooper v. Meridian Yachts, Ltd., 575 F.3d 1151, 1178 n.17 (11th Cir. 2009) (quoting In re Raiford, 695 F.2d 521, 523 (11th Cir. 1983)).  The Relators have not persuasively argued that Lockheed's statements in Ghani should be binding in separate or subsequent cases.  Accordingly, Lockheed's arguments in Ghani cannot be used against Lockheed in this case.

The Relators allege the billing practices violate Lockheed's Corporate Policy Statement ("CPS") 507.[3] That directive only permits overtime when the hours worked are in excess of the normal work schedule and provided that the "extra hours [are] authorized, directed, and in support of operations requirements." (Am. Compl. ¶ 70). Lockheed, however, contends that CPS 507 permits overtime after employees cross a normal work schedule in hours *paid*, not hours *worked*. Lockheed attached a copy of CPS 507 to its motion to bolster its interpretation.[4] The Relators only state they disagree with Lockheed's reading of CPS 507, but they do not provide a convincing

---

[3]The Relators also assert that the amount of time off attributed to Lockheed employees through the scheme they describe violates Corporate Policy Statements 534 and 535. However, the Relators only assert this in a conclusory fashion and do not discuss the terms of the corporate policy statements. (See Am. Compl. ¶ 63). The conclusory allegation is insufficient to defeat a motion to dismiss under 12(b)(6).

[4]While a document that is not attached to the complaint is ordinarily not considered for the purposes of a 12(b)(6) motion to dismiss, "[a] document central to the complaint that the defense appends to its motion to dismiss is also properly considered, provided that its contents are not in dispute." Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999) (citing Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1369 (11th Cir. 1997)). "'Undisputed' in this context means that the authenticity of the document is not challenged." Horsley v. Feldt, 304 F.3d 1125, 1134 (11th Cir. 2002). Here, the Relators only state that they "do not agree with [Lockheed's] reading of CPS 507." (Relators' Resp. in Opp'n. to Def.'s Mot. to Dismiss, at 19 n.13). This does not appear to be an objection to the authenticity of the document. Accordingly, the Court will consider Lockheed's submission of CPS 507.

alternative.[5]  In sum, the Relators have not shown with particularity that the billing scheme they describe violates any Lockheed policy.

The Relators contend that the concealed billing practices contained in the regular disclosures to the government violate Federal Acquisition Regulations ("FARs").  The Relators allege that Lockheed's policies permitting the excessive billing of overtime violate Federal Acquisition Regulation 22.103-2.  That regulation requires contractors to "perform all contracts, so far as practicable, without using overtime, particularly as a regular employment practice, except when lower overall costs to the Government will result or when it is necessary to meet urgent program needs."  FAR 22.103-2.  The associated acquisition regulations define a normal workweek as a 40-hour workweek.  Further, the Relators contend that Lockheed is in violation of FAR 31.201, which requires that all costs passed on to the government be "reasonable, allowable, and allocable."  (See Am. Compl. ¶ 80 (citing FAR

_____

[5]The Relators address Lockheed's reading of CPS 507 in a footnote in their response brief.  The Relators state they disagree with Lockheed's reading of 507, "particularly in light of the other documents Relators possess."  (Relators' Resp. in Opp'n. to Def.'s Mot. to Dismiss, at 19 n.13). The Relators further state that Lockheed "has separate attendance codes for 'Overtime' and for 'Uncompensated Overtime,' which is to be used to 'offset previously taken lost time coded as personal or sick hours.'"  The assertion regarding "uncompensated overtime" was not pled in the complaint, and the origin of this definition is unclear from the Relators' brief.  Accordingly, the Relators are bound by the provisions they cite in their complaint and cannot defeat a motion to dismiss by asserting new, and un-cited, corporate documents that bolster their position.

31.201)).  FAR 31.2, in turn, according to the Relators, defines premium overtime as not reasonable when an employee has worked fewer than 40 hours.  (Am. Compl. ¶¶ 74, 75, 80-82 (citing FAR 31.2)).

Although the Court accepts as true the Relators' allegations that the STARS reports conceal the billing of lost time, there is no indication that the STARS reports were deceiving in a way that violates the FARs.  There is no indication that the United States would consider the billing practices to be fraudulent.  There is no indication that the FARs are violated by the overtime billing practices alleged. Indeed, Lockheed has shown that the government itself assesses overtime based on hours that include paid leave, holidays, or other excused absences.  See 5 C.F.R. § 551.401(b)-(d) and 5 U.S.C. § 5541(2) (defining employee).  The FARs only suggest that contractors should work to minimize overtime charges and be reasonable in their billing. Importantly, the regulations allegedly violated do not proscribe calculating overtime with reference to hours paid as opposed to hours worked.  Overall, the Relators have not pled with particularity facts that indicate the billing scheme they describe actually violates a FAR.[6]

_____

[6]The Relators also contend that the Fair Labor Standards Act ("FLSA") illustrates the extent of the overbilling here because the FLSA defines overtime as only time *worked* beyond 40 hours in a week.  As Lockheed points out, the FLSA only sets a floor for the federally-mandated leave provisions that employers need to honor. The fact that Lockheed may offer more overtime to its employees than the FLSA

In general, the Relators have not shown with particularity that the billing scheme they describe is fraudulent in any way.  In Cade, 2011 U.S. Dist. LEXIS 76085, at *23-34, the court determined that the relator pled neither the fraudulent claim nor the presentment of fraudulent claims to the government with sufficient particularity in her *qui tam* claim alleging that her employer illegally billed Medicare and Medicaid.  Although the court rested its decision on the relator's failure to plead the presentment of false claims to the government, the court also noted that the relator, like the Relators here, did not show with particularity that the alleged conduct was wrongful.  For instance, the relator in Cade alleged that she observed continuous requests for patient's names to be used on specific reimbursement forms even though the patients had never come to the office.  The complaint did not specify for what services the forms were being filled out or, more importantly, why the altered forms were in fact fraudulent. Similarly, the relator alleged that the office she worked for would bill lab tests for routine examinations to a different billing code for which Medicare and Medicaid would support reimbursement.  The relator, however, did not explain in her complaint why the updated codes were false or even inaccurate.  See Cade, 2011 U.S. Dist. LEXIS 76085, at *30-34.

---

requires does not indicate that Lockheed is defrauding the government. The Relators cannot show that paying overtime based upon all hours paid in a work week violates any statute, regulation or company policy.

Here, the Relators have described a coding scheme in the billing system that allegedly leads to overpayments from the government.  Like the relator in <u>Cade</u>, however, the Relators here have not explained how the alleged abuses of the coding system were fraudulent or wrongful.  In <u>Cade</u>, the relator alleged that her employer changed the Medicare billing codes for reimbursement claims but did not explain why those changes were fraudulent.  Here, the Relators allege their former employer allows employees to bill overtime despite working fewer than 40 hours in a week but do not explain why such a practice is fraudulent.  Likewise, the Relators have described an extensive scheme whereby Lockheed hides the distinction between actual hours worked and "lost time" in disclosures to its federal customers, but the Relators do not describe why such a practice is fraudulent. Indeed, the allegations in the complaint do not provide sufficient detail for the Court to determine if any of the alleged practices are in fact fraudulent.  Even the most extreme examples from the complaint, such as Employee 584798's 50.2 hours of lost time and 6.4 hours of overtime coded for the week of April 6, 2007, do not indicate that Lockheed engaged in fraudulent conduct because the Relators have not explained why billing overtime without first working 40 hours in a week is fraudulent. (<u>See</u> Am. Compl. ¶¶ 91-92).  There is nothing to suggest that Lockheed systematically bills the government for work it has not done or for employee hours it has not authorized and paid for.  As in <u>Cade</u>, the allegations

suggest the Relators may suspect fraudulent activity, "but [they] currently ha[ve] little, and maybe no, basis to believe that wrongful acts occurred." Cade, at *33.

Accordingly, the Court concludes the Relators have not pled facts with particularity to show that Lockheed made false or fraudulent claims as alleged in the First Amended Complaint.  Lockheed's motion to dismiss should be granted in this respect.

B.    Count II - Retaliation Under the False Claims Act

The Relators contend that Lockheed retaliated against them in violation of 31 U.S.C. § 3730(h).  That provision provides relief for "[a]ny employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against ... because of lawful acts done ... in furtherance of an action [under the FCA]."  31 U.S.C. § 3730(h); Childree v. UAP/GA AG CHEM, Inc., 92 F.3d 1140, 1146 (11th Cir. 1996).[7]

_____

[7]Congress amended and renumbered the False Claims Act in 2009.  As the events leading up to the filing of this suit preceded the 2009 amendments, those amendments do not apply to this case and the discussions herein refer to the Act before the 2009 amendments. See United States ex rel. Harris v. Lockheed Martin Corp., No. 1:08-cv-3819-AT, 2012 U.S. Dist. LEXIS 165398, at *11 n.3 (N.D. Ga. Mar. 9, 2012) (discussing the applicability of the 2009 amendments to the False Claims Act).

1.    Relator Wood

Lockheed argues that Relator Wood's retaliation claim must be dismissed because he has not pled that he engaged in protected conduct or that he was terminated for engaging in protected conduct.  "Protected conduct" under 31 U.S.C. § 3730(h) has been interpreted by the Eleventh Circuit to provide protection to an employee "when there was at least a 'distinct possibility' of litigation under the False Claims Act at the time of the employee's action." United States ex rel. Sanchez v. Lymphatx, Inc., 596 F.3d 1300, 1303 (11th Cir. 2010) (quoting Childree v. UAP/GA AG Chem., Inc., 92 F.3d 1140, 1146 (11th Cir. 1996)).  "If an employee's actions, as alleged in the complaint, are sufficient to support a reasonable conclusion that the employer could have feared being reported to the government for fraud or sued in a *qui tam* action by the employee, then the complaint states a claim for retaliatory discharge." Sanchez, 596 F.3d at 1304 (citing Mann v. Olsten Certified Healthcare Corp., 49 F. Supp. 2d 1307, 1314 (M.D. Ala. 1999)).[8]

Relator Wood has pled facts to show that he engaged in protected activity by informing Lockheed management of the billing scheme that led to excessive overtime charges on government contracts.  Wood states that he began contacting his

---

[8]The Relators are not required to plead their retaliation claims with particularity, only their fraud claims.  See  United States ex rel. Sanchez v. Lymphatx, Inc., 596 F.3d 1300, 1304 (11th Cir. 2010).

supervisors and Lockheed management about his suspicions of "fraudulent overbilling" to the government in May 2008. (Am. Compl. ¶ 154). Later, on August 21, 2008, Wood sent an email to a Financial Analysis Manager and the Director of Health & Wellness Medical Strategies, among others, detailing how he believed Lockheed was "overbilling" the government. (Am. Compl. ¶ 155). Wood's August 21, 2008, email alone is sufficient to provide his superiors with sufficient information for Lockheed management to fear it could have been reported to the government for fraud. See Sanchez, 596 F.3d at 1304 (citing Mann, 49 F. Supp. 2d at 1314).[9]

Lockheed also argues that Wood has not pled a causal connection between engaging in protected activity and his termination. "The showing necessary to demonstrate the causal-link part of the prima-facie case [of retaliation] is not onerous; the plaintiff 'merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" Mann, 49 F. Supp. 2d at 1317 (quoting Holifield v. Reno, 115 F.3d 1555, 1566 (11th Cir. 1997). Again, Wood's allegations are sufficient to show a causal connection between his protected activity

---

[9]The relevant paragraphs do not directly quote from the communications in question such as the August 21, 2008 email. In allowing the retaliation claim to go forward, the Court is expressly relying upon counsel's representations that the communications concerned fraudulent overbilling of the government.

and his termination.  Wood's allegations rest on two different actions taken by Lockheed.

First, Wood alleges that in August 2008, after he had started sharing his concerns that Lockheed was overbilling the government, Human Resources Vice President Shantella Cooper initiated an investigation into Wood's professional conduct.  The investigation concerned a "fit for duty" medical examination in which Wood had cleared an employee for only certain jobs.  Although Wood had conducted numerous of these examinations during his tenure at Lockheed, he alleges this was the first investigation into his examinations.  The investigation ultimately cleared Wood, but upon his exoneration a human resources employee commented, according to Wood, that "[Human Resources Vice President] Shan[tella Cooper] is not going to like that."  (Am. Compl. ¶¶ 165-169).

Wood next contends that his ultimate termination was in retaliation for his conduct concerning fraudulent billing practices.  In April 2009, Wood met with a human resources official and a medical director and was informed he was being terminated.  On June 2, Wood received a separation notice from Lockheed stating that the reason for his termination was "released," which the notice equated to an "involuntary termination."  (Am. Compl. ¶¶ 170-173).  Wood further alleges that his own staff considered his termination unwarranted and considered him an excellent

leader.  (Am. Compl. ¶¶ 174-175).  Less than two years before his involuntary

termination, Wood had been awarded the Nova Award and the Aerostar Award for his

work on the Six Sigma projects.  (Am. Compl. ¶ 161).

Given Wood's record at Lockheed and the proximity of Wood's new emphasis

on Lockheed fraudulently overbilling the government with the allegedly retaliatory

conduct, Wood has pled sufficient facts to support his claim of retaliation.  Lockheed

argues that the passage of eight months between the email Wood sent notifying

management of his concerns and his ultimate termination eliminates any causal

connection.  While "[t]emporal proximity between protected expression and the

alleged adverse action is relevant circumstantial evidence of causation ... the lack of

temporal proximity becomes relevant only when it is the only evidence relied upon

by the Plaintiff to establish causation." Wiggins v. McHugh, No. CV-109-142, 2010

U.S. Dist. LEXIS 39790, at *9-10 (S.D. Ga. Apr. 22, 2010) (quoting Higdon v.

Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004)).  Here, Wood is not relying on the

temporal proximity between his revealing his concerns of fraudulent overbilling the

government and his termination.  Rather, he is relying on the statements of the human

resources vice president following an investigation into Wood, the general chilled

reception from management, the lack of reasons for his ultimate termination, and,

importantly, the fact that he had received awards for his work less than two years

before his termination.  Wood's allegations suffice to survive Lockheed's motion to dismiss his retaliation claims.  Accordingly, Lockheed's motion to dismiss Relator Wood's retaliation claims should be denied.

### 2.    Relator Isley

Lockheed contends that Relator Isley's retaliation claims must be dismissed because she was not constructively discharged by her reassignment and thus did not suffer an adverse employment action.  "An adverse employment action is conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee."  Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1233 (11th Cir. 2006) (quoting Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000) (discussing adverse employment actions in Title VII context)).  Isley alleges that, on March 20, 2012, about a month after this case was unsealed, Isley was told she would be assuming the FMLA and absence code processing duties of a resigning employee, beginning on April 16.  Isley contends she had previously made clear that she never wanted to take back the FMLA processing duties, which she had handled earlier in her career.  Isley's counsel sent Lockheed's counsel a letter asserting that the reassignment amounted to a constructive discharge and received no

response.  Isley tendered her resignation on April 19, 2012.  (Am. Compl. ¶¶ 176-180).

Isley's allegations are insufficient to withstand Lockheed's motion to dismiss her retaliation claim.  There are no facts alleged in the First Amended Complaint that the assignment of new duties to Isley altered the compensation, terms, conditions, or privileges of her employment.   There is not even an indication that the new assignment would render Isley's workload unmanageable.  Indeed, the crux of Isley's allegations is that she "made it clear to everyone in her department... that she never wanted to take back the FMLA processing duties." (Am. Compl. ¶ 178).  The fact that Isley did not want the new duties assigned to her is insufficient.   "The employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." Cotton, 434 F.3d at 1234 (quoting Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001)).  Although Isley pled she found the reassignment adverse, she has not pled facts to show that  the reassignment was objectively adverse.  Based on the allegations, it seems that Lockheed sought to reassign the coding duties to an experienced employee with little regard for whether the employee wanted the responsibility. The Court concludes a reasonable employee in Isley's circumstances would not have found the reassignment of duties adverse,

especially given the outgoing employee's resignation and Isley's prior experience with the specific duties.   Accordingly, Lockheed's motion to dismiss Relator Isley's retaliation claims should be granted.

      C.    The Relators' Motion for Sanctions Under Rule 11

The Relators filed a motion for sanctions against Lockheed contending that Lockheed's arguments in support of its motion to dismiss the amended complaint were made in bad faith.  The Relators have not shown that Lockheed's motion to dismiss was without factual or legal basis, or that it was filed for an improper purpose. See Fed R. Civ. P. 11(b).  Accordingly, the Relators' motion for sanctions should be denied.  Lockheed's request for costs and attorneys fees in responding to the motion for sanctions should also be denied.

## IV.  Conclusion

For the reasons set forth above, the Court DENIES as MOOT Defendant Lockheed Martin Corporation's Motion to Dismiss [Doc. 28], GRANTS in PART and DENIES in PART Defendant Lockheed Martin Corporation's Motion to Dismiss Relators' First Amended Complaint [Doc. 35], and DENIES Relators Kathy Isley and Mark Wood's Motion for Sanctions Under Rule 11 [Doc. 41].

SO ORDERED, this 28 day of February, 2013.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge